# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br><br>BENJAMIN PAUL EGLI,<br>Defendant. | | Case No. 24-cr-53-CJW<br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |

_____

## I.    INTRODUCTION

On June 26, 2024, the Grand Jury returned an Indictment, charging Defendant with one count of Conspiracy to Sexually Exploit a Child, in violation of 18 U.S.C. Sections 2251(a) and 2251(e); one count of Causing and Aiding and Abetting the Sexual Exploitation of a Child, in violation of 18 U.S.C. Sections 2, 2251(a), and 2251(e); one count of Receipt of Child Pornography, in violation of 18 U.S.C. Sections 2252A(a)(2)(A) and 2252A(b)(1); and one count of Possession of a Child Pornography, in violation of 18 U.S.C. Sections 2252A(a)(5)(B) and 2252A(b)(2).  (Doc. 3.)  The matter before me is Defendant Benjamin Paul Egli's motion to suppress.  (Doc. 24.)  The motion was filed August 16, 2024, and included a list of items to be suppressed.  (*Id.*)  The Government timely filed a response on August 23, 2024.  (Doc. 31.)  The Honorable C.J. Williams, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation.  I held a hearing on Defendant's motion to suppress on August 27, 2024.  (Doc. 32.)

The motion arises from allegedly custodial interviews by law enforcement that occurred in December of 2023 and April of 2024.  Defendant moves to suppress any

1

evidence obtained from the allegedly custodial interviews as well as a search of his phone performed with a signed consent and a subsequent April 2024 search of Defendant's residence, person, and vehicle. Specifically, Defendant seeks to exclude any evidence obtained from the phone seized in December of 2023, any evidence obtained from any and all electronic devices seized pursuant to any search warrants in April 2024, and any statements Defendant made to law enforcement in December of 2023 and April of 2024. (Docs. 24 and 24-1.)

The following Government's Exhibits were admitted without objection:

1.     Cyber Tipline Report dated March 19, 2023;

2.     Interview Recording December 2023;

3.     Consent to Search Mobile Device dated March 19, 2023;

4.     Interview Recording April 2024; and

5.     Search Warrant dated April 5, 2024.

The Government called Bradley Peck[1], Detective with the Tipton Police Department and Kent Moore, Special Agent with the Federal Bureau of Investigation. I found both witnesses credible. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II.     FINDINGS OF FACT

In the summer and fall of 2023, Detective Peck was investigating a "cyber tip" from the National Center for Missing and Exploited Children. The tip suggested a Verizon user with a specific phone number had uploaded three images of "apparent child

---

[1] Detective Peck, a graduate of the Iowa Law Enforcement academy, has been with the Tipton Police Department since 1998 and has been a detective there for 12 years. He has received training and on-the-job experience with conducting interviews of potential suspects.

pornography." (Gov. Ex. 1.) Verizon confirmed that the number was assigned to A. and identified her address in Tipton, Iowa.[2]

Detective Peck made several attempts to contact A. He attempted to reach her on the phone from the cyber tip and was unsuccessful. He was also unsuccessful when he stopped by her residence. Finally, he reached her at a different phone number known to the city utility department. On December 15, 2023, Detective Peck interviewed A. in his office at the police department. Detective Peck testified that he knew of A. previously but had never spoken to her. Nor was he previously aware that Defendant was her boyfriend. A. identified Defendant as her boyfriend and stated that Defendant used the phone number at issue. He did not ask her about child pornography. Detective Peck asked A. if he could speak to Defendant. Detective Peck testified that A. would have understood the request to relate to an official investigation. A. said that Defendant was at home and offered to see if Defendant was willing to talk to him. A. then drove to her home and returned with Defendant.

Detective Peck's secretary notified him when Defendant and A. arrived "up front." (Doc. 35 at 20.) Detective Peck described Defendant's demeanor upon arrival as open, not upset, and curious about what was happening. Detective Peck asked if Defendant would come back to the interview room to talk to him, and he agreed to do so. A. waited in the hallway by the front door. Detective Peck then conducted an audio-recorded interview of Defendant in a 10' x 10' square, windowless interview room at the police station. The room was well lit and contained a small table and a "couple of chairs."

_____

[2] Detective Peck's testimony about the timing was somewhat inconsistent. He testified it was in the fall of 2023, that Verizon confirmed that the relevant phone user was A. who resided at an address in Tipton. (Doc. 35 at 8.) He also testified that it was in July 2023 that Verizon confirmed the phone number belonged to A. and in October 2023 that other law enforcement agencies advised the Tipton Police Department that the number belonged to A. (*Id.* 16-17.) I find that this does not materially detract from Detective Peck's credibility.

(*Id.* at 10.) Detective Peck and Defendant were the only people present. Detective Peck testified he closed, but did not lock, the door to the interview room for privacy, given the expected topic of the discussion, i.e., child pornography. Detective Peck told Defendant the door was unlocked and he was free to leave at any point, but did not ask Defendant's preference regarding whether the door should be closed. Detective Peck stated, "it's a little bit of a maze getting out of here," but, as he explained at the hearing, he did not literally mean that the police department floor plan constituted a maze. Rather, he meant people tended to take a wrong turn when leaving. Detective Peck also explained the doors to exit the building were unlocked and he would have helped Defendant to leave if he wanted to. (*Id.* at 10.)

Detective Peck and Defendant sat on either side of a small table. Detective Peck himself was not positioned between Defendant and the door. Only the table was "partially" between Defendant and the door. (*Id.* at 24.) Defendant never stood up to walk around the interview room and they never discussed whether he was free to do so. Detective Peck was in plain clothes and neither his gun nor badge was displayed. At no time did he draw his gun. Detective Peck described Defendant's demeanor as "very nice, polite, talkative, very open." (*Id.* at 12.) To Detective Peck, Defendant seemed friendly, cooperative, and understood the questions posed to him. Defendant responded with questions that were relevant to the conversation. Defendant never stated he was under the influence of drugs or alcohol, and he did not appear to be under the influence as he was not slurring his speech or having evident memory trouble. Defendant did not say he was suffering from any health problem, and he did not appear to be experiencing any health problem. Nothing about Defendant indicated to Detective Peck that Defendant was incapacitated in any way. At no time was Defendant placed in handcuffs or otherwise physically restrained. Detective Peck denied ever using any "strong-arm tactics" on Defendant or raising his voice. (*Id.* at 15.) Detective Peck also denied threatening,

4

intimidating, punishing, or using violence on Defendant. Detective Peck denied ever drawing his gun or using any deception. Detective Peck was the only officer present during the encounter.

Detective Peck testified that he asked Defendant to come to the police station because it was more convenient for him, and he knew they would have a private setting to talk. Detective Peck testified that the only advantages to conducting the interview at the police station were convenience, privacy, and not having children around. He further testified that he had "good luck" conducting interviews at a person's residence and at the police station. (*Id.* at 21.) Moreover, he had not been trained that it was preferable for law enforcement to conduct interviews at the police station as opposed to a suspect's residence.

Defendant told Detective Peck he was still in possession of the phone in question and admitted that child pornography was possibly on it. Defendant also stated that anything on the phone belonged to him. During the interview Defendant made statements that indicated he believed Detective Peck could remotely access and see the contents of his phone. (*Id.* at 30.) Detective Peck did not suggest to Defendant that any sort of remote access was possible. In fact, although Detective Peck testified law enforcement could obtain warrants for information from third parties (e.g., Facebook, Snapchat, and iCloud), access to the phone itself was not possible without physical possession of the phone. Detective Peck ultimately conceded that there might be some advantage to not correcting a suspect's misunderstanding of law enforcement's ability to access phones remotely. However, Detective Peck testified that he did not believe he failed to disabuse Defendant of his misunderstanding to obtain an advantage. (*Id.* at 34-35.)

While Defendant admitted to possibly possessing child pornography, he did not admit to distributing child pornography, making or producing child pornography, asking

someone to produce or make child pornography, or asking someone to sexually abuse a child. (*Id.* at 25.)

When Detective Peck first asked to take possession of the phone, Defendant did not immediately consent. Detective Peck had been trained that he was permitted to continue the conversation after a suspect refuses consent, and he testified he did so in the instant case.

At the conclusion of the interview, Detective Peck, in his unmarked squad car, a Ford Explorer, followed A. as she drove Defendant to their residence. They entered the home together and Defendant grabbed the phone in question and handed it to Detective Peck. Defendant then signed a "Consent to Search Mobile Device" form. (Gov. Ex. 3.) Although the phone was provided to Detective Peck on December 19, 2023, a forensic report was not generated until March 26, 2024. Detective Peck did not tell Defendant he would seize the phone for over three months. However, Defendant never requested his phone back from Detective Peck.

After receiving a forensic report regarding the phone on March 26, 2024, Detective reviewed the report and "the videos" (presumably videos on the phone). He then forwarded the forensic report along with this observation of the videos to the FBI and the Iowa Division of Criminal Investigation ("DCI").

Special Agent Kent Moore[3] of the FBI testified regarding his April 5, 2024 interview with Defendant. Agent Moore arrived at Defendant's Tipton, Iowa residence with DCI Special Agent Mike McVey at about 3 p.m. The two agents arrived wearing plain clothes in an unmarked vehicle. When they knocked on the door, D., a young man,

---

[3] Agent Moore attended the FBI academy in 2019 and has been assigned to Cedar Rapids since then. He testified that he received training about interviewing suspects at the FBI academy and has had five years of experience since that time. He is the case agent assigned to this matter.

answered the door. The agents asked for Defendant and D. said Defendant was upstairs sleeping but that D. would get him.

Defendant was calm and cooperative when he arrived at the door. The agents' visit woke Defendant because he had been working the night before. The agents identified themselves and asked him to talk with them in Agent Moore's vehicle, a red, unmarked GMC Acadia. Defendant agreed. The vehicle was parked in front of the residence during the entire encounter. Agent Moore was in the driver's seat next to Defendant in the front passenger seat. Agent McVey sat in the back seat. Agent Moore testified they asked Defendant to speak in the car for privacy because they knew people were in the residence. The agents made an audio recording of the interview.

Agent Moore testified that Defendant appeared calm, relaxed, friendly, and cooperative. Defendant appeared to understand the questions posed to him and Defendant did not appear to be under the influence of drugs or alcohol. Defendant did not seem to be suffering from any physical or mental condition, nor did he appear otherwise incapacitated or lack understanding. While Agent Moore learned from a later interview that Defendant was on antianxiety medication, he observed nothing about Defendant's behavior that was concerning. Some of Defendant's answers seemed "somewhat vague" where the answers might incriminate him. (Doc. 35 at 40-41.)

Agents Moore and McVey paused the interview and exited the vehicle. Then Agent Moore and FBI Special Agent Derek Miller entered the car with Defendant. Like the earlier interview with Detective Peck, Agent Moore testified that at no time was Defendant placed in handcuffs or otherwise physically restrained. Agent Moore testified that Defendant was free to leave. The doors to the vehicle were closed but not locked and could be opened by Defendant. Agent Moore denied ever using any "strong-arm tactics" on Defendant or raising his voice. Agent Moore also denied threatening, intimidating, punishing, or using violence on Defendant. None of the agents drew his

7

gun or used any deception, although Agent Moore's sidearm was on his right side and, therefore, closer to Defendant. No more than two officers were present during the interview.

As discussed at the hearing, Defendant's challenge to the warrant is limited to the allegation that it is the product of the allegedly custodial interviews and the involuntary consent to the search and seizure of the phone. (Tr. 3.) Thus, there was little testimony about the warrant itself and the Court must principally rely on the contents of the warrant itself to explain its role in the investigation. The warrant application sought permission to search Defendant's Tipton, Iowa residence, Defendant's vehicle, and Defendant's person. Defendant seeks to suppress "Any and all electronic devices seized pursuant to any search warrants in April 2024." (Doc. 24 at 1.)

Agent McVey signed the warrant application and affidavit. The application and warrant appears to have been finalized shortly after the April 5, 2024 interview in Agent Moore's vehicle. The affidavit contains statements by Defendant from the two allegedly custodial interviews. Moreover, the affidavit describes items found on the phone during a forensic search after it was seized by Detective Peck. This information will be described in more detail in the discussion below.

### III.   DISCUSSION

#### A.   Parties' Arguments

Defendant first contends "it is clear that Defendant was in custody when he was interrogated at the Tipton Police Department and when he was interrogated by law enforcement in April of 2024." (Doc. 24-2 at 3.) Defendant concludes that the six non-exhaustive indicia of custody enumerated in *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) favor a finding that he was in custody and, therefore, owed a *Miranda* warning.

8

Second, Defendant contends that Defendant's statements to law enforcement were not voluntary, but the product of coercion by law enforcement. Defendant asserts the Government cannot meet its burden to show by a preponderance of the evidence that the statements were voluntary.

Third, Defendant argues that his consent to have the phone searched was not freely given. Defendant maintains that any consent he gave was tainted by law enforcement's unlawful and coercive custodial interrogation. Defendant asserts that the Government cannot meet its burden to show by a preponderance of the evidence that the consent was voluntary.

Finally, Defendant asserts that the warrant obtained in April 2024 relied on information obtained from the interrogations. Without the fruit of these allegedly unlawful interrogations, Defendant concludes, the warrant lacked probable cause and the products of the warrant must be suppressed.

The Government disagrees. First the Government argues that Defendant was not in custody during the December 15, 2023 interview, his statements were voluntary, and he voluntarily consented to the search of his phone. The Government similarly argues that Defendant was not in custody during the April 2024 interview and that his statements at that time were voluntary. Further, the Government argues that Defendant voluntarily consented to the search of his phone in December 2023. Finally, the Government argues that the warrant is supported by probable cause, or, in the alternative, the *Leon* good-faith doctrine is applicable.

### B.    Relevant Law

"The familiar *Miranda* rule provides as a general matter that investigators must communicate warnings to a suspect before conducting a custodial interrogation." *United States v. Armstrong*, 39 F.4th 1053, 1056 (8th Cir. 2022). "*Miranda* warnings are required only when a person is in custody, because they are intended to 'protect the

individual against the coercive nature of custodial interrogation.'" *United States v. Soderman*, 983 F.3d 369, 376 (8th Cir. 2020) (quoting *United States v. Thomas*, 664 F.3d 217, 222 (8th Cir. 2011), in turn quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011)). Interrogation "refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "A person is considered to be in custody for the purposes of *Miranda* warnings when there is a 'formal arrest or restraint [on his or her] freedom of movement of the degree associated with formal arrest.'" *United States v. Sandell*, 27 F. 4th 625, 628-29 (8th Cir. 2022) (quoting *United States v. Parker*, 993 F.3d 595, 601 (8th Cir. 2021)).

In determining whether a person is in custody, courts consider: "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *Unites States v. Mshihiri*, 816 F.3d 997, 1003 (8th Cir. 2016) (alteration in original) (quotation omitted); *see also United States v. Giboney*, 863 F.3d 1022, 1027 (8th Cir. 2017) ("This determination is not based on the interrogator's perspective; 'the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his [or her] situation.") (Quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). In making this determination, the Eighth Circuit Court of Appeals has held that courts should consider the following six factors:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed

during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). "While the foregoing list is decidedly non-exhaustive, the presence or absence of these particular indicia of custody have been influential in this court's assessment of the totality of the circumstances surrounding an official interrogation." *Id*. The first three *Griffin* factors tend to show that an individual was not in custody; while the three remaining factors tend to show that an individual was in custody. *Giboney*, 863 F.3d at 1027.

"A statement is involuntary when it is extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Sandell*, 27 F.4th at 630 (quoting *United States v. Roberts*, 975 F.3d 709, 718 (8th Cir. 2020)). In determining whether a defendant's will has been overborne, courts examine the totality of the circumstances, "'including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure.'" *Id*. (quoting *United States v. Magallon*, 984 F.3d 1263, 1284 (8th Cir. 2021)). Factors for making this determination include "'the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition.'" *Magallon*, 984 F.3d at 1284 (quoting *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011)).

"A warrantless search is valid under the Fourth Amendment if it is 'conducted pursuant to the knowing and voluntary consent of the person subject to a search.'" *United States v. Gastelum*, 11 F.4th 898, 904 (8th Cir. 2021) (quoting *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005)). The burden is on the Government to show that a defendant knowingly and voluntarily consents to a search. *Id*.; *see also United States v.*

*LeBeau*, 867 F.3d 960, 970 (8th Cir. 2017) ("'The government bears the burden of proving voluntary consent to a search by a preponderance of the evidence[.]'") (Quoting *United States v. Willie*, 462 F.3d 892, 896 (8th Cir. 2006)). "A defendant's consent is voluntary if it was the product of an essentially free and unconstrained choice by its maker, rather than a product of duress or coercion, express or implied." *United States v. Sallis*, 920 F.3d 577, 582 (8th Cir. 2019) (quotation omitted). The "'issue turns not on the defendant's subjective state of mind, but on whether the officer reasonably believed the defendant consented.'" *Gastelum*, 11 F.4th at 904 (quoting *United States v. Magallon*, 984 F.3d 1263, 1280 (8th Cir. 2021). In other words, "'whether it was reasonable for the officer to believe that the suspect gave him permission to search the requested item.'" *Id*. (quoting *Magallon*, 984 F.3d at 1280). In evaluating whether consent is voluntary, courts consider the totality of the circumstances, including the following factors:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*Id*. (alteration in original) (quoting *United States v. Carr*, 895 F.3d 1083, 1089 (8th Cir. 2018)).

*C.*     *Analysis*

*1.*     *December 2023 and April 2024 Interviews*

I find that, on December 15, 2023, when Defendant spoke with Detective Peck, Defendant was not in custody for purposes of *Miranda*. I have considered the *Griffin* factors and make the following findings. First, at the outset of the interview, Detective Peck told Defendant the "door's not locked, you're free to go at any time you want. I know it's a little bit of a maze getting out here, but I'll show you out if at any time you don't want to talk to me, you just want to hop up and leave." (Gov. Ex. 2 at 00:08-00:18.) I find it is not reasonable to believe anyone with Defendant's apparent faculties would believe that an actual maze presented an obstacle to his leaving. It is clear from the record before the Court that the interview was voluntary, Defendant was free to leave, and Defendant was not under arrest. Indeed, Defendant was not arrested on December 15, 2023, and, as outlined above, Detective Peck informed Defendant that he was free to leave at any time. *See United States v. Elzahabi*, 557 F.3d 879, 884 (8th Cir. 2009) ("An 'explicit assertion that the defendant may end the encounter . . . generally removes any custodial trappings from the questioning.'") (Quoting *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006)).

Second, Defendant possessed unrestrained freedom of movement during the interview at the Tipton Police Department. Inside the police interview room, where the interview was held, Defendant remained unrestrained, he was never handcuffed, and the door to the room remained unlocked. As discussed above, Detective Peck told Defendant that he was free to leave at any time. (Gov. Ex. 2; Doc. 35 at 10-11, 15.) Defendant was also unrestrained when he traveled with A. from the police station to their residence. Detective Peck drove in a separate vehicle to Defendant's residence. (Doc. 35 at 13.) Defendant was again unrestrained and not handcuffed at his residence. Defendant and

13

A. let Detective Peck into their residence and Defendant gave Detective Peck the phone. (*Id.* at 13-14.)

Third, after speaking with A. regarding the phone, A., who informed Detective Peck that the phone belonged to Defendant, offered to go home and see if Defendant would be willing to go to the police station to speak with Detective Peck. About ten to fifteen minutes later, Defendant and A. came to the police station and Defendant agreed to speak with Detective Peck. (*Id.* at 9.) Thus, the circumstances support a finding that Defendant voluntarily acquiesced to the interview.

Fourth, based on the record before the Court, there is no evidence that Detective Peck employed strongarm tactics or deception on Defendant. Detective Peck was straightforward with Defendant informing him repeatedly that he wanted to collect Defendant's phone for forensic analysis and if Defendant refused to consent to analysis of the phone, he would seek a search warrant. (Gov. Ex. 2.) There is no evidence that Detective Peck raised his voice, threatened Defendant, or intimidated Defendant. (Doc. 35 at 15.) Further, Defendant was free to end the conversation and leave the interview room at any point during the interview, but he did not. Additionally, Detective Peck described Defendant as "nice," "polite," "talkative," "friendly," and "cooperative." (*Id.* at 12.) *See United States v. Muhlenbruch*, 634 F.3d 987, 997 (8th Cir. 2011) (finding that a defendant's friendliness and cooperation demonstrates a non-custodial situation) (citing *United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002)).

Fifth, the interaction between Defendant and Detective Peck occurred at the Tipton Police Department. Detective Peck was not in uniform, and his gun and badge were never displayed. (Doc. 35 at 11.) "*Miranda* warnings are not required simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *see also Griffin*, 922 F.2d at 1352 ("The question is whether the entire context of the questioning,

including such considerations as place and length of the interrogation, demonstrates that the course of the investigation was police dominated."); *see also Elzahabi*, 557 F.3d at 884 ("Where there is no clear indication that the defendant's freedom to depart is restricted, a police station interview is non-custodial.").

Sixth, Defendant was not placed under arrest at the end of the questioning and was allowed to leave and return to his residence. Defendant was also not placed under arrest after Detective Peck collected Defendant's phone at his house.

Therefore, based on the totality of the circumstances, I find that neither the interview at the police station nor the interactions between Defendant and Detective Peck during the collection of Defendant's phone at Defendant's residence, constituted custodial interrogations subject to *Miranda* warnings.

I also find that Defendant's statements were voluntary. Here, there is no evidence of police coercion. There is no evidence that Detective Peck extracted information from Defendant using threats, violence, or promises. *See Sandell*, 27 F.4th at 630. The interview was not coercive, and the length of the interrogation was under sixty minutes. While the conversation took place at the Tipton Police Department, this factor does not weigh heavily against the voluntariness of the meeting and conversation for the reasons discussed above. There is no evidence of Defendant being physically or mentally impaired or lacking the requisite maturity for the meeting and interview to be voluntary. (Doc. 35 at 12-13.) *See Magallon*, 984 F.3d at 1284. Therefore, based on the totality of the circumstances, I find that Defendant's interview and interaction in collecting the phone with Detective Peck on December 15, 2023 was voluntary.

Turning to the 2024 interview, I find that, on April 5, 2024, when Defendant spoke with Agents Moore, McVey, and Miller, Defendant was not in custody for purposes of *Miranda*. I have considered the *Griffin* factors and make the following findings. First, at the outset of the interview, Agent McVey told Defendant that he was

not under arrest. (Gov. Ex. 4 at 4:34-4:35.) Both agents also told Defendant that when they were finished speaking with him, he could return to his residence. (*Id.* at 4:36-4:39.) Further, when the agents asked Defendant whether he had a minute to talk with them, Defendant said "Yeah" and walked with the agents to Agent Moore's vehicle and got into the passenger seat of the vehicle. (*Id.* at 4:11-4:19, 4:39-4:51.) Based on the record before the Court, it appears that the interview was voluntary, and Defendant was not under arrest. Indeed, Defendant was not arrested on April 5, 2024.

Second, inside Agent Moore's vehicle, Defendant was unrestrained, he was never handcuffed, and the doors to the vehicle were unlocked.[4] Defendant voluntarily sat in the vehicle during the interview. Agent Moore testified that Defendant was not physically restrained in any way and was free to leave the vehicle if he wanted to. (Doc. 35 at 42.) Based on the record before the Court, it appears that Defendant possessed unrestrained freedom of movement during the interview.

Third, as discussed above, when asked whether he had a minute to talk with Agents Moore and McVey, Defendant responded, "Yeah." He then voluntarily accompanied Agents Moore and McVey to Agent Moore's vehicle and sat in the front passenger seat of the vehicle. (Gov. Ex. 4 at 4:11-4:51.) Thus, the circumstances support a finding that Defendant voluntarily acquiesced to the interview.

Fourth, based on the record before the Court, there is no evidence that Agent Moore or McVey employed strongarm tactics or deception with Defendant. There is no evidence that any law enforcement officer raised his voice, threatened Defendant, or intimidated Defendant. (Doc. 35 at 42-43.) Further, Defendant was free to end the conversation and leave the vehicle at any point during the interview, but he did not. Additionally, Detective Moore described Defendant as "calm," "relaxed," "friendly,"

---

[4] Agent Moore testified that vehicle did not have any child safety lock engaged and, unlike some law enforcement vehicles, the doors could be opened from inside the vehicle.

and "cooperative." (*Id.* at 39-40.) *See United States v. Muhlenbruch*, 634 F.3d 987, 997 (8th Cir. 2011) (finding that a defendant's friendliness and cooperation demonstrates a non-custodial situation) (citing *United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002)).

Fifth, the interaction between Defendant and Agents Moore and McVey took place outside Defendant's home in an unmarked vehicle parked in front of his house. Agents Moore and McVey were dressed in plain clothes. No law enforcement officer ever displayed a gun. (Doc. 35 at 37, 43.) There were never more than two law enforcement officers in the vehicle with Defendant during the interview. Thus, the circumstances support a finding that atmosphere during the interview was not police dominated.

Sixth, Defendant was not placed under arrest at the end of the questioning and was allowed to leave and return to his residence.

Therefore, based on the totality of the circumstances, I find that the interview in Agent Moore's vehicle was not a custodial interrogation subject to *Miranda* warnings.[5]

I also find that Defendant's statements were voluntary. Here, there is no evidence of police coercion. There is no evidence that any agent extracted information from Defendant using threats, violence, or promises. *See Sandell*, 27 F.4th at 630. The interview was not coercive. The length of the interrogation was under sixty minutes, as the agents paused the interview to seek a search warrant. The conversation took place outside Defendant's home in Agent Moore's unmarked vehicle. There is no evidence of Defendant being physically or mentally impaired or lacking the requisite maturity to render the encounter involuntary. (Doc. 35 at 40-42.) *See Magallon*, 984 F.3d at 1284.

---

[5] Apparently, at some point both Agent Moore and Agent McVey exited the vehicle for an unspecified period of time. At some point, Agent Moore returned to the vehicle. Also, at some point, FBI Special Agent Derek Miller got into the vehicle. It is unclear what role, if any, Agent Miller had in the interview. (Doc. 35 at 42.)

Therefore, based on the totality of the circumstances, I find that Defendant's interview with Agents Moore, McVey, and Miller on April 5, 2024 was voluntary.

### 2. *Consent to Search the Phone*

I find that, on December 15, 2023, Defendant voluntarily consented to the search of his phone. I have considered the factors outlined in *Gastelum* and make the following findings. First, Defendant was 29 and had attended a community college. He worked as a patient care technician at the University of Iowa Hospitals and Clinics. Second, there is no evidence that Defendant was intoxicated or under the influence of drugs when he consented to the search of his phone. (Doc. 35 at 12-13.) Third, Defendant was not informed of his *Miranda* rights. Fourth, Defendant had experience in the criminal justice system, having been convicted of fifth degree theft in 2013. Moreover, throughout the December 2023 interview, Defendant discussed issues of self-incrimination, acknowledged his right to consent or not to consent, discussed the possibility of a search warrant, discussed issues regarding forensic review of the phone, discussed the possibility of arrest, and discussed officer training for conducting an interview. (Gov. Ex. 2 at 12:15-14:10, 20:49-21:56, 27:35-28:00, 41:08-45:20.) Taken as a whole, it is clear Defendant understood what was happening during the interview. Fifth, the entire encounter, both the interview and collection of the phone from Defendant's residence lasted less than one hour. Sixth, there is no evidence of threats, physical intimidation, or punishment to extract consent from Defendant. (Doc. 35 at 15.) Seventh, there is no evidence that Detective Peck made any promises or misrepresentations to Defendant to obtain consent. (*Id.* at 16.) Defendant's misunderstanding of law enforcement's capability to remotely access his phone, was not the product of any deception by Detective Peck. Eighth, as discussed in the preceding section, Defendant was not in custody or under arrest when he provided consent to search the phone. Ninth, consent was given at

18

Defendant's residence. Tenth, Defendant did not object to providing consent for the search.

Additionally, and significantly, Defendant signed a "Consent to Search" form which stated:

> I have been informed of my constitutional right not to have a search made without a warrant of the mobile device[.] . . . However, knowing my right to refuse consent to search, I, [Defendant], hereby authorize [Detective] Peck and other law enforcement officers assisting them to conduct a complete search of the mobile device, including all data connected with the device.
>
> I further authorize [Detective] Peck to take possession of the associated mobile device . . . in order to conduct a complete search of the contents of the mobile device[.] . . .

(Gov. Ex. 3.) The consent form also stated: "The written permission is given by me to the above-named persons voluntarily and without any threats or promises of any kind[.]" (*Id.*) *See United States v. Czeck*, 105 F.3d 1235, 1239 (8 th Cir. 1997) (finding a signed consent form to be the most important factor in finding consent to be voluntary); *see also United States v. Rakotojoelinandrasana*, 450 Fed. App'x 549, 551 (8th Cir. 2011) (per curiam) (unpublished) (relying on *Czeck* in finding a signed consent form to be the most important factor in finding consent to be voluntary).

Accordingly, based on the totality of the circumstances, I find that Defendant's consent to search the phone was voluntary.

### 3. *Alternative outcomes*

While I have recommended the Court conclude that the Defendant was not in custody during either interview in question, and that his consent to search of his phone was voluntary, the Court may disagree on one or more of these points. Depending on which point (or points) the Court disagrees, the results become complicated.

19

First, if the Court decides that either of the interviews were custodial and, therefore, a *Miranda* warning should have been given to Defendant, then the statements he made in that interview should be suppressed for trial purposes. *See United States v. Carter*, 884 F.2d 368, 371-72 (8th Cir. 1989) (holding that when an interrogation is determined to be custodial, statements made by a defendant prior to receiving *Miranda* warnings must be suppressed); *see also United States v. Ollie*, 442 F.3d 1135, 1140 (8th Cir. 2006) (holding that failure to advise a defendant of *Miranda* warnings requires suppression of statements made during a custodial interview).

Second, if the Court decides that either of the interviews were custodial and, therefore, a *Miranda* warning should have been given to Defendant, then the statements he made in that interview should not have been included in the affidavit in support of the search warrant. The Court must then decide whether the redacted affidavit supports a finding of probable cause. In making this finding regarding a warrant affidavit which includes tainted information, courts must ask, "'first, would the police have applied for the warrant had they not acquired that tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them.'" *United States v. Rodriguez*, 834 F.3d 937, 942 (8th Cir. 2016) (quoting *United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008)). If removing the tainted information from the warrant removes the basis for probable cause, anything seized in the search based on the warrant must be suppressed. *Murray v. United States*, 487 U.S. 533, 542 (1988). However, if the warrant with the information redacted still contains probable cause, any search based on the warrant was valid, barring other constitutional violations or deficiencies. *Swope*, 542 F.3d at 616-17 (finding application supported probable cause when reading the untainted portions of the warrant at issue).

The warrant application contains relatively little "information obtained from the unlawful interrogation of the Defendant" in December 2023. (Doc. 24-2 at 5.) I find

that the following paragraph contains all Defendant's statements to Detective Peck that were included in the application for the search warrant:

> During a non-custodial interview, BENJAMIN EGLI advised that number was associated with a phone that he used to use, but that it had broken some time ago. BENJAMIN EGLI advised during the interview that there was possibly child pornography on the phone and that anything found on that phone would belong to him. During the conversation [Detective] Peck asked BENJAMIN EGLI if [Detective] Peck could take possession of the phone, after discussion he advised that [Detective] Peck would be able to take possession of the phone and that he would give [Detective] Peck consent to search the phone.

(Doc. 31-5 at 5.) If the Court concludes the December 2023 interview was custodial and Defendant's statements must be redacted from the affidavit, I recommend the Court find that the warrant nevertheless contains probable cause. Law enforcement knew from A., as stated in the affidavit, that the number was associated with the phone being used by Defendant. Law enforcement also knew from the forensic examination of the phone that it contained child pornography information. Thus, even if Defendant's statements from the December 2023 interview (*and only these statements*) are redacted, a neutral magistrate could conclude the warrant contained probable cause.

The warrant also contained the following statements from the April 2024 interview in Agent Moore's vehicle:

> Egli's primary residence is [Tipton address]. He stays at his residence in North Liberty a couple days a month. He has a cell phone in the residence at [Tipton address]. He remembers [M.] touching the toddler in the bathtub, toddler's penis, in a picture. There is nothing on his new phone. He has never touched a child.

(*Id.* at 7.) If the Court concludes the April 2024 interview was custodial and the statements made during that interview should be excluded because no *Miranda* warning was provided, I recommend the Court find the affidavit nevertheless contains probable

21

cause. First, the affidavit cites other evidence tying Defendant to the Tipton residence. Second, while law enforcement may not have known Defendant had a new phone, the scope of the warrant was broad enough to include such a device. (*Id.*) Third, even without his statement regarding the picture of the toddler, the warrant application contains sufficient information tying Defendant and the places to be searched to sexual exploitation of a child and/or child pornography. Indeed, even if the Court redacts Defendant's statements from both the December 2023 and April 2024 interviews, the affidavit contains substantial evidence from which a magistrate could have concluded probable cause existed for the requested searches.

The warrant also contains a description of the child pornography found on Defendant's phone as a result of the forensic search performed with Defendant's consent. Defendant's phone also seems to have led law enforcement to identify M., the mother of the toddler depicted in the images on the phone. Having identified M., authorities then searched M.'s residence and obtained from her statement about Defendant's alleged directions to her to create child pornography. Thus, the decision regarding the existence of probable cause becomes more difficult if the Court finds that the consent to search Defendant's phone was involuntary and redacts that information.

If the Court decides that the search of the phone was performed without Defendant's voluntary consent, then I recommend it review the warrant after redacting all of the information gleaned from that search. The required redaction begins with: "On 03/26/24, Officer Peck was able to download the information received from JFACT." (*Id.* at 5). The redaction includes all of the text that follows and concludes with: "We seized [M.'s] phone and I am conducting a forensic review today." (*Id.* at 6.) In addition, one part of the statement Defendant made on April 5, 2024 appears to be fruit of the phone search and discussion with M.: "He remembers [M.] touching the toddler in the bathtub, toddler's penis, in a picture." (*Id.* at 7.) In other words, if Defendant's

consent is defective, all the information derived from the phone search should be redacted along with the information about M. and from M. as fruit of the poisonous tree.

If all the information obtained as a result of the phone search is (*and just this information*) is redacted, I recommend the Court find there was still probable cause for the search. Even after redacting the information on the phone found as a result of the forensic inspection, the affidavit would contain the cyber tip that the phone Defendant was uploading child pornography images. The redacted affidavit would also still contain Defendant's admission from the December 2023 interview that there was possibly child pornography on the phone and anything on the phone belonged to him. This information, together with Agent McVey's explanation that, according to his experience and training, individuals participating in child exploitation and pornography retain images, store them in more than one place, and use multiple devices (*id*. at 4), is sufficient to support probable cause.

However, if the Court finds the December 2023 interview was custodial and that the consent to search was involuntary, then redaction of the statements from the December interview and the results of the forensic search doom the probable cause. Without this information, the only evidence of Defendant's involvement in child pornography is the cyber tip regarding Defendant's phone already in law enforcement's possession. I find it improbable that law enforcement would seek a warrant based solely on this information—especially given the months-long investigation that followed receipt of this very tip. Moreover, I do not believe the warrant contains probable cause without either the December 2023 interview or the contents of the phone. Thus, I recommend the Court suppress the evidence obtained as a result of the search warrant if it finds the December 2023 interview and the consent to search violated Defendant's Fifth Amendment rights.

If the Court finds only the consent to search the phone and the April 2024 interview unconstitutional and suppresses the forensic search and Defendant's statements, it should still find probable cause for the search. As stated above, I would find the December 2023 interview statements along with other unredacted material sufficient to support probable cause.

Finally, for the sake of completeness, if the Court finds the December 2023 interview, the April 2024, and the search of the cell phone to be unconstitutional, then the Court should suppress the evidence. Without any of this evidence, the sole support for probable cause is the cyber tip which, for the reasons described above, is inadequate.

### 4. Leon *Good Faith Exception*

If the Court disagrees with me regarding whether the interrogations were custodial or whether the consent to search the phone was voluntary, it would need to consider the *Leon* good faith exception. Defendant contends that "without the information obtained from the unlawful interrogation of the Defendant in December of 2023 and April of 2024, and without information unlawfully obtained as a result of the unlawful seizure of the Defendant's phone, the 'redacted' affidavit no longer established probable cause." (Doc. 24-2 at 5.) The Government responds that "even if the Court finds that the warrant is not supported by probable cause, the warrant should be upheld under the good-faith exception." (Doc. 31 at 27.)

Under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well-trained officer would have known that the search was

illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id*. at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id*. at 922-23 (footnote omitted). "For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, [law enforcement's] prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d

663, 667 (8th Cir. 1997)). If the prewarrant conduct is clearly illegal, however, the exception does not apply. *Cannon*, 127 F.3d at 413.

None of the four scenarios contemplated by *Leon* apply here. As discussed above, I find that neither the interview at the police station nor the interactions between Defendant and Detective Peck during the collection of Defendant's phone at Defendant's residence constituted custodial interrogations subject to *Miranda* warnings. Similarly, I find that the interview in Agent Moore's vehicle, involving Defendant and Agent Moore and Agent McVey was not a custodial interrogation subject to *Miranda* warnings. Furthermore, I find that Defendant's interview with Detective Peck on December 15, 2023, and Defendant's interview with Agent Moore and Agent McVey on April 5, 2024 were both voluntary. I also find that Defendant's consent to search the phone was voluntary. Nothing on this record shows that any of Detective Peck's, Agent Moore's, or Agent McVey's conduct related to the December 2023 and April 2024 interview or December 2023 consent to search the phone were "clearly illegal." Instead, the record shows that the interviews and consent to search the phone never strayed from, or far from, the line of validity. *See Cannon*, 127 F.3d at 413. Thus, I find that Detective Peck's, Agent Moore's, and Agent McVey's conduct was close enough to the line of validity to justify law enforcement's belief that the search warrants were objectively reasonable. *See id*.

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 24.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the

parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 24th day of September, 2024.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa